Case number 23-1752, Higuchi International Corporation v. Autoliv ASP Inc. Oral argument not to exceed 15 minutes per side. Steven Van Stempert for the appellant, you may proceed. Good morning, Your Honors. Steve Van Stempert for Higuchi. I'd like to reserve three minutes for rebuttal if that's okay. Thank you. So this is a contract interpretation case. It's going to be quite narrow, and it's going to depend on the terms of the purchase orders that Autoliv drafted. And we know from Airbus that in order for there to be an enforceable requirements contract, there needs to be mutual obligation. Obligation has to flow both ways. And we know that the buyer's obligation has to be linked to its actual needs. It's got to be either all or a set share of its actual needs. And, of course, you need that objective measure, because otherwise the buyer can just choose whatever quantity he wants, and there's no enforceable obligation. Now, Airbus explains the test for determining whether this is the case on page nine. It's not an enforceable requirements contract if the buyer can just issue releases for zero quantity, even if its actual needs are higher, and still not be in breach of the contract. Because what that does is that demonstrates that the releases are not actually tied, not linked to its actual needs. They can just issue releases for zero regardless of what their actual needs are. Now, this purchase order that Autoliv drafted is exactly that type of purchase order. So a hypothetical kind of explains how this is the case. So let's imagine that Autoliv has actual needs of 100 parts. But for whatever reason, it can find them cheaper from somewhere else. It issues a release to Higuchi for zero parts. How many times did it do that? It hasn't. So it hasn't done that, right? But the Airbus court is very clear that course of conduct is not something that can create the quantity term. Can I ask you a different question, which is what I'm puzzled by is it seems like for a while, you all were negotiating price in the purchase orders, and then all of a sudden it stopped. And I know the quantity term is what we're focused on, but I'm just trying to get some background. How did that happen? So this program has been going on for a long time, right? The purchase orders, I think, were entered into quite a while ago. And there has been negotiation. There was a separate arbitration or something that happened with Judge Rosen. So there was negotiations back and forth. There were disagreements about pricing, about whether we had the right to terminate or whether or not. So there's a lot of negotiation in the background. But you're right, Your Honor. The question here is after Airbus was decided, and Airbus was decided on July 23. So before July of 23, you were negotiating price, and Airbus has decided, and then Autolift stops negotiating price? So I think what happened is that there are ongoing negotiations about who is obligated to be bound by these particular purchase orders, right? The purchase orders were this relationship was entered into quite a while ago. And there's an ongoing negotiation about, okay, are we actually obligated? Because Michigan law was unclear before Airbus, and so there was some play in the joints there about who is actually obligated to be stuck with what. Airbus was decided, and then it becomes clear that, okay, this is actually not an enforceable requirements contract. That changes the ballgame, right? So that's where we are now. And again, I think the— Wait, wait. I'm still confused. I'm sorry. So you didn't answer my question. They were negotiating the price before Airbus and then stopped after, or Autolift was doing it for a while after and then stopped? I believe there have been ongoing negotiations the whole time, right? I mean, in terms of trying to negotiate who's responsible for what, whether we're in or whether we're out. And is there any evidence that they ever got parts from anywhere else? Because I understood the answer to that question to be no. I think the answer is no. Okay. And final question for a while, I promise, is the declaration that you all filed seems to treat this as a requirements contract. It seems to me. Okay, so the declaration that we filed, again, I think the parties— so Airbus is pretty clear, right? It's going to depend on the actual terms of the purchase order, right? So the party's subjective expectations don't change what the obligations actually are. If there's no mutuality of obligation, it doesn't matter what the parties may have thought, right? It's depending on the terms of the purchase order. No, I agree with that. It's just all interesting background as to how to figure this out. Sure. Sure, Your Honor. So I think it actually helps, right, with the hypothetical that it began. Because that helps concentrate on the terms of the purchase order as drafted by Autolift. And again, Autolift drafted these. It could have drafted them differently, but it drafted them in such a way to give itself significant discretion. So let's imagine that Autolift has actual needs of 100 parts, okay, but issues a release to Higuchi for zero parts. Now, Higuchi complains, but at that point, Autolift has a bulletproof contract defense. It says, well, look at the terms of the purchase order, right? Yeah, we agree to purchase our requirements from you, but look at sentence number three. We can change our requirements, the quantities of requirements whenever we want. And if we do that, then our liability is going to be capped at whatever is in a release. So at the end of the day, Autolift's liability depends only on what it puts in a release. It is not dependent on its actual needs. So there's no link between the releases of emissions. Can you have a non-exclusive requirements contract in Michigan? Yes, you can. Yes, you can have it. So it's unlike other jurisdictions. So other jurisdictions say if it's a requirements contract, it's automatically exclusive. And that's, of course, part of the consideration that is given up by a buyer in those other jurisdictions, to give up the right to go out on the market and get the parts from somewhere else. That's not the case in Michigan. Airbus says you can have non-exclusive requirements contracts in Michigan. And, of course, that changes the ballgame for Michigan as opposed to other jurisdictions because, number one, the consideration is different. And, number two, you can have a scenario where you're going to need greater specificity because it just says requirements. Well, that doesn't tell us, is it all requirements? Is it part requirements? Is it 70%, 20%? So there's a good reason that Airbus said it's got to be all or a set share. You've got to have some specificity here. And that may be unique in some respects to Michigan, but that's a facet of what Michigan law is. You know, I know you make reference to – I'm sorry. Judge Clay? Yeah, are you saying that this is a non-exclusive requirements contract or is this a release-by-release agreement? Yes, Your Honor. So this is a release-by-release agreement. And, again, it's that way because under sentence four of the Statement of Work, AutoLeave's liability is only going to be capped at whatever's in the release. So they're not going to pay for something if it's not in a release. And that's different than an actual enforceable requirements contract. In an actual enforceable requirements contract, it doesn't really matter what they put in their release because they're liable for their actual needs. Here, they're not liable for their actual needs. They're only liable for what they put in the release. And, again, that's the way that AutoLeave drafted this. AutoLeave drafted this purchase order to give itself maximum discretion, right? We don't have to be bound by anything we don't want to buy. And it did that, and it gave itself maximum discretion. But it turns out after Airbus, it doesn't actually have any obligation whatsoever, which means it's not an enforceable requirements contract. You know, you referenced both Note 1 and Article 25 from the contract. But do we need to go beyond this one paragraph and the statement of work? I don't think so. With respect to making a determination in this matter, we just really the first couple of sentences or maybe the whole paragraph, that one paragraph, starting with the blanket contract. That's really the confines of the language of the contract that would be before us for interpretation. That's all you need, right? That's exactly right. Obviously, Article 25, they have a determination by convenience. They can just end this whenever they want, even if they find a better price. But yes, for our purposes today, all we need to do is focus on the statement of work. Because it's clear. I mean, what Autolieve says is say, well, look at the first sentence of that statement of work. We use the term requirements, and so therefore, well, it must be an enforceable requirements contract. We know that's not the case. Advanced Plastics that had the word requirements in it, and it was an enforceable requirements contract. Ultra Manufacturing, right, opposing counsel represented the seller in that case, and they made the same argument that we're making here, which is to say, you know, in Ultra Manufacturing, the purchase order said this is a requirements contract, and the court and opposing counsel successfully argued, well, that doesn't matter. You have to look at the rest of the terms of the purchase order to determine whether it's an enforceable requirements contract. And if you look at the rest of the terms, it's not. Would you agree if the word all, of course, there's been much discussion about that, had been asserted in the statement of work before requirements, this would be a requirements contract? No. It would not? No, and the reason for that is because of sentences two, three, and four. As we explained, if you go through the analysis, at the end of the day, auto leave is going to have a bulletproof contract offense, right, because a gucci would say, hey, wait a minute, you agreed to purchase your requirements, all of your requirements, and auto leave is going to say, no, under sentence three, we can change the quantities of our requirements whenever we want, and in that event, our liability is going to be capped at whatever we put in our release. And so at the end of the day, their liability for parts is going to be based on a release by release basis. But they couldn't get it anywhere else if the word all is in there. Well, under sentences two, three, and four, absolutely they could, because they can change. So sentence three says, we can change the quantities in the requirements, right? We reserve the right to change the requirements. Yeah, but that's all they need, because they could have different demand at that time. Well, so that's one of the arguments that the district court kind of went with, was that, well, maybe sentences two, three, and four, that really applies to the release process. That's really describing the release process. But the problem with that is that it uses the word requirements. It doesn't use the word release. So, and I think either way, right, the auto leave is going to have a problem, right? If the word requirements in sentences two, three, and four, if that word requirements is used as a synonym for release, well, then the word requirements in sentence one is also going to have to be a synonym for release, and then they lose, because then it's a release by release contract. On the other hand, if the word requirements means requirements in sentences two and three, then they still lose, because they can change the quantities of their requirements whenever they want. And, of course, their liability would be capped at whatever's in the release, so it's also a release by release contract. So either way, it's a release by release contract, and they lose. And, again, I do want to emphasize, auto leave is the one who drafted it this way. They drafted it this way to give themselves maximum discretion. Really what they have here is they have a situation where they can kind of hang on to Gucci kind of on a retainer basis. Yeah, but you signed it. I mean, why should, I mean, you're two sophisticated corporations. You could have negotiated a different term there. I don't believe this was, I mean, this is a purchase order, right? I don't think we signed it. I mean, obviously the parties have been operating under it. I don't disagree with that. But the same issue is involved in Airbus, right? Sophisticated parties there. Again, part of this is because of the muddled state of Michigan law before Airbus. So before Airbus. Right, the contract that you signed, was it statement of work or whatever it was, agreed that this is the way it would be done. So it's a purchase order that's issued. Again, I don't think we signed it. But, yeah, we're performing under the purchase order, yes. But, again, part of that is because of the muddled state of Michigan law before Airbus. So there were a lot of cases back and forth about the word blanket. That's an acceptable quantity term that's in this purchase order. And so for a long time the industry operated this way. And then Airbus kind of rectified things. It clarified the law and said, look, all of these arrangements, the ones that are like this, are totally one-sided. And it turns out those aren't enforceable after all. And so, of course, that kind of was a game changer. And that's why we're here. And, again, sophisticated parties were in Airbus as well. You know, if this is a release-by-release situation, why did you need the overarching agreement at all? Because it sounds like you're saying that the contractual obligations are governed by the release. The parties could just submit a release or govern their behavior based upon a release whenever parts were needed or ordered. But you've got this overarching agreement here. If this is just a release-by-release situation, why did you need this agreement? Thank you, Your Honor. So Airbus speaks to this. Airbus says, look, in a release-by-release contract scenario, you can have a purchase order that kind of expresses the general terms. And then when an immediate need comes up or an immediate request comes up, there's a release. And then each party can decide, okay, do I want to accept this release or not? And then you don't have to renegotiate price terms, everything else that's under the purchase order and the standard terms and conditions. So that can speed up the process when a specific release is issued. Then the seller can say, okay, I'm going to accept this under the terms that we've already kind of laid out. So that makes it more efficient. And, again, Airbus, I think, speaks to that directly. Your Honor, I'm sorry. No, I believe you're out of time, aren't you? Yes, that's what I was just going to say. So I'm happy to save the rest of my work for rebuttal. Thanks. You'll have your rebuttal. Good morning. May it please the Court. Jason Killips for AutoLeave. I want to pick up on something that Brother Counsel said here at the podium. He said that Michigan law was unclear before Airbus, that it was muddled, not in any way that has anything to do with this case. Airbus focused on determining whether the word blanket, standing alone, stated a quantity term. And it did something new. It overruled some previous cases that held that it did. But that's not an issue in this case. The rest of what Airbus did, this master class that Justice Welch wrote on how requirements contracts work and when it's a requirements contract and when it's a release-by-release contract and the enforceability and all of that, was based on case law that has been around for decades. Can I ask you, because it seems to me it has to be unambiguous for you to win, right? I think so. But I think that it is also. Okay. Well, I find one argument difficult, and it's the one your Brother Counsel, as you called him, was focused on, which is that requirements seems to be used as release in here. In other words, delivery shall be made only in the quantities and time specified in such requirements. And then it says at the end that you shall be under no obligation, the supplier, unless the delivery or fabrication of such parts or the acquisition of such raw materials was specifically authorized in a release. And so it seems to me you could substitute in a requirement, and they're interchangeable, and that makes it ambiguous to me. Now explain to me why I'm wrong. Of course. So I think what sentences two and three are really referring to in that statement of work is they're talking about the information that is conveyed. Yes, in this case it is conveyed in a release. But the information that is conveyed is what our requirements are. Here's how many parts we require today. Here's how many parts we require tomorrow. Here's how many parts we require next week. But that's odd terminology then, in such requirements. What if you put delivery shall be made only in the quantities and at the time specified in the release? Everyone would understand that because that's exactly what your releases do. They list the date you ordered them and the quantity for each part. Yes, but what the document is communicating is, in fact, the specifics of that release or, excuse me, the specifics of that requirement. The Michigan Supreme Court drew a distinction between the quantity term and the total and specific quantity. Right, I get that. And so here what we're talking about when we get into sentences two and three is we're talking about the specific quantities that are needed, that are required, on a specific date. But even though that's there and that those sentences allow for variability, they allow for changes because, of course, your requirements can change. We're in the middle of an automotive supply chain here, right? We don't need these parts for our own purposes. We need them so that we can fill the needs of our customer. And as we all know, OEMs shut down. They have labor issues. They need to do maintenance. Whatever comes up, their needs vary. And so ours must vary as well. All the variation talked about in sections two and three or sentences two and three are getting at is that there is going to be that variation and that you can't just, as the seller, show up at our dock one day with 100 parts saying, well, we guessed that you would need all of these, so we made them. You have to pay us now. What the Statement of Work says is we're going to buy all our requirements from you. It covers auto leaves requirements. It's very plain about that. But then it says they're going to vary. We're going to tell you what we need. Can they renegotiate the price without accepting the release, or do they always have to accept the release? No, there's a stated contract price. The contract's enforceable for the life of the applicable vehicle program plus the service parts provision. That's all in the first sentence of the Statement of Work paragraph, and there's a stated price. Doesn't that seem odd that you wouldn't negotiate? Because the purchase order basically indicates it's in perpetuity. Well, it's not in perpetuity. There is a stated term, and there are also agreements between the parties to index various aspects of the cost. The stated term is upon the termination of the vehicle platform. Right, which runs for about six years plus the service parts period. So there is a stated term there. I mean, the parties know how long Ford is building the current Mustang, for instance, right? The whole industry is aware of how long these programs are running. So from a durational standpoint, this is a definite duration. We have that. And then the quantity, I think, is clear from the plain language of that first sentence. It says it covers auto lease requirements. You know, to use Brother Counsel's example, if we need 100 parts today, we look at all the contracts laid out in front of us that we have, and this one says it covers auto lease requirements, we have to purchase these parts from Higuchi. If we went somebody where... Well, the language doesn't quite say that auto lease will obtain everything pertaining to its requirements. It says that in the first sentence. But then in a later sentence, it takes all that back, where it says that auto leave reserves the right to change from time to time the quantity specified in any part requirement, and auto leave is under no obligation to the supplier unless there's a release that's delivered. And so really, this language doesn't require auto leave to do anything in terms of specified quantities or time of delivery or being bound not to change the agreed-upon term. None of that's in here. Under this language, it can do pretty well anything it wants to. With all due respect... The only thing that's binding is when there's a release. So this doesn't look like a requirements contract. This looks like a release-by-release sort of agreement based upon this language. Well, with all due respect, Your Honor, I simply disagree with that. I think we're confusing two distinct issues where one does not logically lead to the other. On the one hand, we have this idea that our requirements may vary, and in fact, our requirements may even drop to zero. Judge Posner recognized that as far back as the Empire Gas case in the Seventh Circuit, and that's a foundational case in requirements contract body of law. And so our requirements, as long as they're in good faith, may drop to zero. They may fluctuate. They may vary. And, of course, our obligation is limited to the requirements as we communicate them. But that's to the specific quantity. What does not change, and what sentences 2, 3, and 4 of that statement of work do not change is alter the fact that if we have a requirement, it is covered by this contract, and therefore we must go to Higuchi. Otherwise, we would breach... That's not what it says. It says that I don't believe reserves the right to change from time to time the quantity specified, and it's not bound to anything unless a release is issued and delivered. That's what it says. It says the specific quantities may change, yes, but it doesn't say that if we have a requirement, we can go anywhere else, to anywhere other than Higuchi. And that is just the nature of a requirements contract. I don't see in here anywhere it says that auto leave is contractually bound only to deal with Higuchi. I don't see that anywhere in here. I think it is clear from the very first sentence. When it says it covers auto leave's requirements, that means if auto leave has a requirement, it is covered by this contract. Could I ask you about the vehicle platform? You mentioned that it may last around six years or so. But is that clear anywhere in the contract? You mentioned the Mustang. The Mustang has been around forever. So are you talking about, like, let's just say the Mustang and its current, I don't know, configuration or model, so that maybe in 2026 the Mustang has a different platform but it still has the same name, I guess. You've got it right, Judge. So, yeah, these auto companies, the OEMs, do a regular vehicle refresh. Often it's every six years. It can vary a little bit. Sometimes it gets extended. Sometimes it gets cut a little shorter. But, yes, that's when we all notice that the Mustang looks a little bit different. Okay. So at the end of six years, let's just pick that number, Higuchi and auto leave would have to renegotiate, presumably, in terms of the, I'll call it the supply contract. Sure. So if we get to, and we'll keep using the Mustang as an example just because I really like Mustangs. Using that as an example, when Ford gets ready to roll out and start its new Mustang program, it's then going to take bids from suppliers like auto leave. And if we're lucky enough to win that business, then we have to negotiate with suppliers to see who wants to help supply us with the parts that we need. That'll be a totally new contract. It is not covered by the current existing purchase orders. That'll be a new negotiation, new contracts.  Thank you. Yeah. Where I think, one of the places where I think that the parties are approaching this from different angles, Higuchi seems to argue that this is a moment-to-moment requirements contract, not a true requirements contract. And I'm basing that off the brief. I'm also basing that a little bit off of what Brother Counsel said at the podium this morning. What I think Higuchi is getting at is that nothing obligates auto leave to buy its next moment's requirements from Higuchi. And that's the language that we've been talking about. Yes, it covers auto leave's requirements, but then it does go on specifically to say that it does this for the period beginning on a specific date and ending upon the termination of the vehicle platform. So that is the language that says not only is it our requirements today, but tomorrow and the next day and the day after that. Would the inclusion of the word all in front of requirements in the first sentence make any difference in terms of how we would interpret the party's requirements here? No, I don't think so. Or the party's obligations? No, I don't think so. I think buyer's requirements has to mean all buyer's requirements. As long as buyer's requirements is unqualified. I didn't know we were going to be in Nashville when I wrote the guitar collector example, but I'm in the right city for this. If a guitar collector said he was going to sell me all of his Stratocasters for $50,000 and I showed up with my $50,000 check and he showed up with only some of his Stratocasters, I would be upset, and rightfully so. Because without qualification, my Stratocasters means all my Stratocasters. Wouldn't a contract be clearer if the word all had been included? You're just saying it's not necessary. I don't think it's necessary. It would have forced Higuchi to come up with a different argument about why it could wiggle out of these contracts, but it wouldn't change. So it would make my argument here different because we'd be fighting about a different issue instead, but it wouldn't change the meaning of the contract one bit, I don't think. If you had all in the first sentence, why wouldn't the second sentence? I'm still a little puzzled by why requirements isn't interchangeable with release. It just seems like I could make an argument. Everyone would understand this contract if it said, delivery shall be made only in the quantities and at the time specified in the release. Sure, that would also eliminate another argument here. I'll give you that. But none of these words, or at least neither of them, release nor requirement are terms of art that have very specific legal definitions. You've got to read the contract in context and apply a plain English understanding to it, and by its plain text, if we are saying we are going to communicate, specify I think is the word the contract uses, we're going to specify our requirements to you. Yeah, we're going to do it in a release. Fine, we're going to call it that or call it a scheduling agreement or call it whatever you want. But we're going to communicate those releases to you, and those communicated releases, the specific quantities we need on specific days, that might fluctuate. But explain to me what in such requirements means. In the communicated information about what those requirements will be. It all comes back to the information communicated, not necessarily the vehicle by which you do it. Companies don't only call these things releases. Some of them call them scheduling agreements. Some of them call them production schedules. Some call them EDIs, electronic data. And you agree, right, you can have non-exclusive requirement contracts in Michigan? I do agree that you can, although maybe this is an argument for a different day unless the court's particularly interested. I don't think Michigan is really much of an outlier there. I think what Michigan is saying is that if this contract said it was to cover 70% of auto lease requirements, that would be enforceable too. What case says that? None of them do. I haven't seen a non-exclusive requirements contract case anywhere in this country. I look fairly often. Does this advanced plastic case help your argument or hurt it? I think it helps us because it definitely draws a contrast between a case like ours here where there is no qualification on the word requirements and a case like advanced plastics where it said our obligation is to buy our requirements to the extent of, right, only so far as we choose to communicate them in a release. And it's that language, that to the extent of, that this court rightfully focused on in advanced plastics and said, ah-ha, we see what you're doing here. You're actually limiting your obligation to buy not to your requirements but to whatever you choose to put in a release, which could be all and could be none. So it's a release-by-release contract. I didn't use those words, but that's what we were talking about in that case. Here there is no such qualification. There is nothing in the language anywhere in the statement of work or anywhere else in the terms and conditions that says that auto leave, if it has a requirement, despite this language in the contract that says it covers auto leave's requirements, that would allow auto leave to go anywhere else. That's just what the plain language of that paragraph means. If there are no other questions, my time seems to have expired. Thank you. Thank you very much. Thank you. Thank you, Your Honors. Just a few quick points in rebuttal. So first of all, picking up on this last point, really the only way they can get there is if they argue that the word requirements means two wildly different things in precisely the same paragraph that auto leave itself drafted. I don't think that's a strong position. And I think it's important to note, if you look at this from Higuchi's perspective, can Higuchi sue auto leave if auto leave chooses, in our example, to issue a release for zero when it has actual needs of 100? And he can't. I mean, there's a bulletproof contractual defense here that auto leave has. You just point to the language in the purchase order, the subsequent sentences, and it's pretty clear that their liability is capped at whatever is in a release. They're not going to pay for anything that's not in a release. It doesn't matter what their actual needs are. They're not going to pay for it if it's not a release. That is a release-by-release contract. The point about, you know, the argument is that the word requirements itself, you just look at the first sentence, it says requirements, and so necessarily it's exclusive. That, of course, Michigan recognizes non-exclusive requirements contracts. And we also know from cases like advanced plastics, which was pointed to in Airbus. Airbus pointed to advanced plastics as an example of an arrangement that was not a requirements contract. And even though in advanced plastics the purchase order used the word requirements, Airbus said, look, that's not an actually enforceable requirements contract, regardless of the terms. And, of course, the same thing shows up in ultra-manufacturing. I think we're all, you know, I think all the parties kind of agree on that. And that makes sense because you can't just say, you know, this is a requirements contract, but I, the buyer, don't want to buy anything I don't want to buy. You know, even though you use the word requirements, it doesn't mean that there's actual mutuality of obligation. You have to look at the rest of the terms. You say that Airbus overruled the Dayco case. Is that clear that that actually happened? So Airbus undermined the underpinnings of the Dayco case. So Dayco relied on, I believe, Johnson Controls. And Johnson Controls said, look, the quantity term as rel, which stands for as released, that's a sufficient quantity term. That's clearly not the law under Airbus. Under Airbus you can't just say, hey, we'll just, our quantity term is whatever we release. That's absolutely not the rule under Airbus. Under Airbus you have to specify either all or a set share of your actual needs, because if your liability is just dependent upon your release and is not actually linked to what you actually need, then it's just a release-by-release contract. So that's the answer for that one. Unless the court has additional questions, we can wrap it up there. Thank you. Thank you, Your Honor. The case will resubmit it, and the clerk may call the next case.